Alan D. Halperin, Esq.
Donna H. Lieberman, Esq.
Julie Dyas Goldberg, Esq.
**HALPERIN BATTAGLIA BENZIJA, LLP**
40 Wall Street, 37th Floor
New York, New York 10005
Phone: (212) 765-9100; Fax: (212) 765-0964
ahalperin@halperinlaw.net; dlieberman@halperinlaw.net;
jgoldberg@halperinlaw.net

*Proposed Counsel to the Debtor and Debtor-in-Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
In re:

**MYPLAY DIRECT, INC.,**

Chapter 11 Case
Case No. 16-12457

Debtor.
----------------------------------------------------------------x

**MOTION FOR AN ORDER (I) AUTHORIZING THE DEBTOR TO
OBTAIN POST-PETITION SECURED FINANCING; (II) MODIFYING THE
AUTOMATIC STAY; AND (III) SCHEDULING A FINAL HEARING**

MyPlay Direct, Inc., as debtor and debtor-in-possession (the "Borrower" or the

"Debtor"), by its proposed counsel, Halperin Battaglia Benzija, LLP, respectfully represents:

**PRELIMINARY STATEMENT**

1.    The Debtor makes this motion (the "Motion") for an order, pursuant to

sections 105(a), 364(c) and 364(e) of Title 11 of the United States Code (the "Bankruptcy

Code") and Fed. R. Bankr. P. 4001 and 9014, on an interim and final basis, seeking:

    I.    authorization for the Borrower to obtain up to $600,000 in principal amount of post-petition financing (the "DIP Financing") on the terms and conditions set forth in the proposed interim order annexed hereto as **Exhibit A** (the "Interim Order") and the Debtor-in-Possession Credit Agreement[1] to be executed and delivered (as hereafter amended, supplemented or otherwise modified from time to time in accordance with

---

[1] Capitalized terms used but not defined herein shall have the meaning assigned to such terms in the Interim Order.

{00258630.2 / 1136-001 }

the terms hereof and thereof, the "DIP Agreement"; together with all agreements, documents and instruments delivered or executed in connection herewith or therewith, including, without limitation, the DIP Commitment Letter and Budget (as defined in paragraph 18 below), in each case as hereafter amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Documents"), among the Borrower, the lenders from time to time party thereto (collectively, the "DIP Lenders"), and MyPlay DIP LLC, as administrative agent and collateral agent for itself and the DIP Lenders (in such capacity, the "DIP Agent");

II. authorization for the Debtor to execute and deliver the DIP Agreement and the other DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

III. authorization for the Debtor to use the DIP Lenders' Cash Collateral and all other DIP Collateral (as defined in paragraph 18 below), in each case subject to the terms and conditions of the Interim Order;

IV. to schedule, pursuant to Bankruptcy Rule 4001, an interim hearing (the "Interim Hearing") on the Motion to be held before this Court to consider entry of the Interim Order;

V. to schedule, pursuant to Bankruptcy Rule 4001, a final hearing for this Court to consider entry of a final order approving the Motion, which order shall be substantially in the form of the Interim Order and otherwise contain terms and conditions acceptable to the DIP Agent in its sole discretion (the "Final Order");[2] and

VI. to grant the Debtor such other and further relief as the Court may deem just and proper.

## BACKGROUND

2. On August 25, 2016 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code and has continued in the management and operation of its business and property as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

3. No creditors' committee or trustee has been appointed in this case.

       4.       MyPlay is a Delaware corporation that was created in 2009 as a wholly-owned subsidiary of SONY DADC New Media Solutions Inc. ("<u>SONY</u>").  The company began as an internal services unit providing end-to-end digital marketing and commerce services within Sony Music Entertainment and in the fall of 2012 forward began servicing third parties as a direct to consumer e-commerce business with multiple online stores focusing on media, music and entertainment. From this point on, MyPlay sold SONY products, SONY excess inventory, and owned third party products, and entered into license agreements with third parties to design, manufacture and sell products relating to particular musical artists and television shows. (MyPlay has never had its own manufacturing facilities; the manufacturing was outsourced to third parties.)  The products and inventory were then offered online to fans of the musical artists and television shows.  On occasion, e-mail lists of fans were provided to MyPlay by SONY or others, and the online marketing would be supplemented by direct e-mail marketing.

       5.       In late 2012, SONY entered into a sub-sublease with The Limited Stores (the "<u>Limited</u>") for executive office and design space at 400 Lafayette Street in New York City. The Limited itself was a subtenant, as its affiliate, Limited Brands, Inc. had entered into a lease dated March 19, 2007 with landlord Sand Associates for the second and third floors at 400 Lafayette Street and then, pursuant to a sublease dated August 3, 2007, Limited Brands, Inc. subleased all of that space to the Limited.

       6.       The SONY sub-sublease, which was dated December 5, 2012, was solely for the second floor space at 400 Lafayette Street (the "<u>Premises</u>"), not for the second and third floor space leased by the Limited, and pursuant to a Sub-Sublease Assignment and Assumption Agreement dated February 10, 2015, SONY assigned the sub-sublease to MyPlay (hereinafter

---

[2] As discussed in this Motion, the Debtor will seek authorization to grant the DIP Lenders liens on the proceeds of Avoidance Actions in the Final Order, and to provide a waiver of the section 506(c) surcharge.  These provisions do

the "MyPlay Lease".)  The assumption and assignment to MyPlay was consented to in writing by both the Limited and Sand Associates, the ultimate landlord, and provides, among other things, that MyPlay indemnifies SONY for any claims, liabilities and damages relating to MyPlay's failure to perform its obligations as tenant under the MyPlay Lease from the effective date of the assignment forward.

7. The base rent under the MyPlay Lease is currently $946,156.10 per year. Pursuant to the MyPlay Lease, MyPlay is also obligated to pay additional rent, including direct payments to utility companies for gas and electric service, and payments to the Limited for MyPlay's proportional share of real estate taxes, the costs of water and sprinkler service, and the salary of a lobby attendant.  The total annual cost to MyPlay under the MyPlay Lease is in excess of $1,150,000, and is by far MyPlay's single largest recurring expense.

8. In late 2015, SONY negotiated the sale of its ownership interest in MyPlay to MyPlay Acquisition LLC, a Delaware limited liability company that was and is owned by CN Partners II, LLC (90%) and SONY (10%).  The stock sale occurred on February 1, 2016.

9. As a result of SONY's sale of its interest in MyPlay to MyPlay Acquisition LLC, in which SONY has only a 10% interest, the Debtor no longer sells SONY's excess inventory.  It generally continues to perform under its license agreements, and where license agreements have expired pursuant to their terms, to sell off remaining inventory with the knowledge and cooperation of the licensors.  At present, MyPlay's business is predominantly the sale of such inventory, and the marketing and sale of vinyl records.

10. In an effort to reduce its overhead, MyPlay has moved from an in-house e-commerce platform that costed the company more than $200,000 per month, to "Shopify," an e-

not appear in the Interim Order.

commerce platform that permits the Debtor to maintain its "Popmarket" website for less than $1,000 per month. Online orders are processed for MyPlay by Shopify and are then relayed through an e-commerce logistics automation solution called Hub Logix to MyPlay's warehousing and fulfillment provider, Alliance Entertainment, a company that provides storage and distribution services to retailers in the music and entertainment industries. In addition to warehousing MyPlay's inventory and fulfilling MyPlay's orders, Alliance Entertainment also maintains its own media product inventory, which, due to MyPlay's custom integration, MyPlay has the ability to sell through Popmarket. MyPlay utilizes this integration to sell products it does not have in stock, broadening its assortment and helping to fulfill orders of sold out products.

11. MyPlay has eleven employees, who work from both the premises that are subject to the MyPlay Lease and from the premises at 33 Irving Place in New York City. Per the Debtor's books and records, it currently has no secured debt, and is current in its payment obligations to both of its landlords. Some pre-petition taxes may be unpaid, either in the ordinary course of the accrual/billing cycle, or as a result of the bankruptcy filing.

12. In the past six months, the Debtor has taken steps to decrease its overhead, such as transitioning to a significantly less expensive e-commerce platform, reducing the number of employees from over 50 employees to eleven key employees, and where possible, eliminating costly software solutions. (By way of example of the last item, MyPlay is moving from NetSuite to Quickbooks.) In addition, MyPlay has allowed many of its license agreements to expire pursuant to their terms, as the licenses were on terms that were highly unfavorable to the Debtor. The Debtor's operational changes have enabled it to move from losses of $500,000 per month to losses of $100,000 per month, exclusive of the impact of the MyPlay Lease.

13. MyPlay has some outstanding obligations and unpaid bills in connection with its licenses and products, and certain highly unfavorable license agreements, which it hopes to address in this Chapter 11 case. However, the critical problem that exacerbated MyPlay's financial and business difficulties and made the filing of a bankruptcy case a necessity is the MyPlay Lease obligation of more than $97,000.00 per month, and the behavior of MyPlay's landlord with respect to that obligation. The Debtor's dispute with its landlord is described more fully in the Bernstein Declaration (defined below).

14. MyPlay intends to move to assume and assign the MyPlay Lease immediately after the Petition Date, although there will be a period of time prior to the proposed effective date of the assignment during which the Debtor will continue to pay rent. If the Debtor is able to assign the MyPlay Lease, it will be able to focus its attention and energy on the longer term issue of determining the best course for the business. MyPlay's preference would be to complete a true restructuring and negotiate a plan of reorganization with creditors.

15. As of the Petition Date, the focus of the Debtor's operations is its vinyl records business, which has been optimized for the sale of existing owned inventory, the pre-release of new vinyl records and high-margin print-on-demand products. The Debtor has also been working diligently to maximize the value of its relationships in the digital media world to explore new, low-cost forms of data-driven and video marketing in order to strategically improve its product offerings and net profits. MyPlay is hopeful that if the financial drain of the MyPlay Lease can be eliminated, the business may be able to generate positive cash flow by the end of the fourth quarter of 2016. But whatever happens, the Debtor intends to do its best to stabilize its operations, and maximize value for the benefit of its estate and creditors.

16.     Additional information regarding MyPlay's business, capital structure and the circumstances leading to this chapter 11 case is contained in the Declaration of Jeremy Bernstein Pursuant to Local Bankruptcy Rule 1007-2 (the "Bernstein Declaration") filed contemporaneously herewith.

## THE SALIENT TERMS OF THE PROPOSED
## POST-PETITION FINANCING FACILITY

17.     Prepetition, the Debtor operated its business without traditional lender-based secured financing.  However, the Debtor was not able to stay current in the payment of all of its bills, and its cash position declined in the months prior to the Petition Date, as profits were not sufficient to meet all of MyPlay's payment obligations.

18.     The Debtor evaluated its cash position early in the summer, and based on the anticipated cash needs of the Debtor for the post-petition period, as evidenced in the Budget attached hereto as **Exhibit B**, determined that it is necessary for the Debtor to secure financing in order to achieve a successful reorganization in Chapter 11.  The following is a summary of the salient terms of the proposed post-petition financing facility from MyPlay DIP LLC, as well as financing terms required to be identified pursuant to Bankruptcy Rule 4001(c).  It is submitted that these terms are necessary, justified and reasonable under the circumstances of the case:[3]

    a. Commitment.  (i)  $250,000(the "Interim Order Commitment Amount") available after entry of the Interim Order; and (ii) $350,000 (the "Final Order Commitment Amount") available after entry of the Final Order, for a total loan of $600,000 (the "Total Commitment Amount").

    b. Interest, Economic Terms and Fees.  The fee letter that accompanies the DIP Commitment Letter (the "DIP Fee Letter") contemplates a

---

[3] Capitalized terms used in the summary but not otherwise defined in the Motion shall have the meanings assigned to them in the Interim Order.  To the extent that the summary and the terms of the Interim Order conflict or are inconsistent, the terms of the Interim Order shall control and govern.

{00258630.2 / 1136-001 }    7

facility fee (the "Facility Fee") in an amount equal to 2.0% of the Commitment fully earned and payable as follows: (i) upon funding of the Interim Order Commitment Amount, 2.0% of the Interim Order Commitment Amount; and (ii) upon funding of the Final Order Commitment Amount, 2.0% of the Final Order Commitment Amount. In addition to the Facility Fee, the DIP Fee Letter contemplates reimbursement of all reasonable out-of-pocket fees and expenses, including fees and expenses of counsel, up to a maximum amount of $30,000, as detailed more fully in the DIP Commitment Letter. Interest will accrue at the rate of eight percent (8%) and the default rate of interest will be an additional two percent (2%).

c. Identity of Lender. The DIP Agent, MyPlay DIP LLC, is an affiliate of CN Partners II, LLC, which indirectly owns 90% of the equity of the Debtor. It is anticipated that if the DIP Agent sells participations in the DIP Financing, that the additional lenders may be individuals with ownership interests in CN Partners II, LLC.

d. Liens to be Granted to Lender Including Proceeds from Avoidance Actions. Pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, the Debtor is to grant to the DIP Lenders valid, binding, enforceable, unavoidable and fully perfected security interests and liens (collectively, the "DIP Liens") in, against, and upon all prepetition and post-petition real and personal, tangible and intangible property and assets of the Debtor of any kind or nature whatsoever, wherever located, whether now existing or hereafter acquired or arising, including, without limitation, all cash (including all Cash Collateral, wherever held), cash equivalents, bank accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, securities (whether or not marketable), equipment, goods, fixtures, real property interests, intellectual property, general intangibles, investment property, supporting obligations, letter of credit rights, commercial tort claims, if any, all inter-company notes held by the Debtor, trademarks, trade names, licenses, rights to payment including tax refund claims, and causes of action (excluding actions for preferences, fraudulent conveyances, and other avoidance power claims under sections 544, 545, 547, 548, 550, 552(b) and 553 of the Bankruptcy Code (the "Avoidance Actions"), but, subject to entry of the Final Order, including the proceeds and recoveries from the Avoidance Actions (the "Avoidance Action Proceeds"), and, upon entry of the Interim Order, including avoidance actions under section 549 and related proceeds and recoveries under section 550 of the Bankruptcy Code in respect of the DIP Collateral, and the proceeds, products, offspring, rents and profits of all of the foregoing, including insurance proceeds (all of the foregoing, collectively, the "DIP Collateral").

e.  Superpriority Administrative Claim. The Obligations arising under or in connection with the DIP Facility (including for fees, costs and expenses described herein of the DIP Agent, Collateral Agent and the Lenders, the "DIP Claims") shall constitute allowed administrative expense claims equal in priority to a claim under section 364(c)(1) of the Bankruptcy Code, and except as otherwise provided in the Interim Order with respect to the Carve-Out shall have priority over all other costs and expenses of administration of any kind and be payable from and have recourse to all assets and property of the Debtor, including, subject to entry of the Final Order, the proceeds of any avoidance actions.

f.  Effect on Existing Liens and Claims. The Debtor does not believe there are any prepetition liens; however, the DIP Liens will be subject and subordinate to any perfected liens in place as of the Petition Date.[4]

g.  Carve-Out. The DIP Liens and the Superpriority Administrative Claim shall be subject to a carve-out for the payment of U.S. Trustee fees, Court costs and professional fees, as set forth in the Interim Order.

h.  Timing. The DIP Commitment Letter expires upon (i) September 6, 2016 (the "Closing Date"), but in no event shall the Interim Order Commitment Amount be available after such date for any reason whatsoever without the written consent of the DIP Agent unless the Interim Order on terms and conditions satisfactory to the DIP Agent shall have been entered on or before such date. In addition, the DIP Lenders agree to hold the Final Order Commitment Amount available until the earlier of (i) a material breach by the Borrower under the DIP Commitment Letter or (ii) October 6, 2016, but in no event shall the Final Order Commitment Amount be available after such date for any reason whatsoever without the written consent of the DIP Agent unless the Final Order on terms and conditions satisfactory to the DIP Agent shall have been entered and the DIP Loan Documents shall have been executed and delivered on or before such date.

i.  Conditions to Funding. The DIP Agent shall have received on the Closing Date each of the following, each dated the Closing Date unless otherwise indicated or agreed to by the DIP Agent, in form and substance satisfactory to the DIP Agent: (i) A copy of the Interim DIP Budget, in form and substance acceptable to the DIP Agent and the Lenders; (ii) There shall have been paid to the DIP Agent, for the account of the DIP Agent and the Lenders, as applicable, all fees due and payable on or before the Closing Date and all reasonable expenses

---

[4] The Debtor has made a motion for authority to pay its warehouse in the ordinary course of business, and is unaware of any other party that has or may assert a lien.

    due and payable on or before the Closing Date; (iii) the Interim Order shall have been entered by the Bankruptcy Court no later than seven (7) days after the Petition Date and shall be in form and substance satisfactory to the DIP Agent; (iv) all first day motions that have been filed in the Case and all related orders entered by the Bankruptcy Court shall be in form and substance satisfactory to the DIP Agent and its counsel; (v) there shall not have occurred or exist any event or condition (other than the commencement of the Case) that has resulted or would reasonably be expected to result in a material adverse effect upon the Borrower.

j. <u>Maturity Date</u>. Absent any Event of Default, the maturity date of the DIP Facility will be the earlier of the effective date of a plan, the date of payment in full of the Debtor's obligations under the DIP Facility and nine (9) months from the Petition Date.

k. <u>Events of Default</u>. The DIP Commitment Letter sets forth a number of customary Events of Default relating to, among others, entry of an order modifying the order approving the post-petition financing facility, appointing a trustee or an examiner with expanded powers in the case, sale of all or substantially all of the Debtor's assets or conversion or dismissal of the case

l. <u>Indemnification</u>. The DIP Commitment Letter contains a indemnification provision in favor of the DIP Lenders and certain other parties for claims pertaining to the DIP Loan, including an agreement that the Debtor will indemnify and hold harmless the Indemnified Parties (as defined therein) in connection with the post-petition financing facility and documents, and related matters.

m. <u>Right to Credit Bid.</u> In the event of a sale of the Debtor's assets, the DIP Lenders will have the right to credit bid up to the amount of the Debtors' outstanding payment obligations to the DIP Lenders under the DIP Facility.

n. <u>Waiver of 506(c) Surcharge</u>. Subject to entry of the Final Order, no costs or expenses of administration of the case or other charge, lien, assessment or claim incurred at any time by the Debtor or any other person or entity will be imposed or charged against any or all of the DIP Agent, DIP Lenders, or their claims or the DIP Collateral under Section 506(c) of the Bankruptcy Code or otherwise.

## THE DEBTOR REQUIRES
## POST-PETITION FINANCING
## IN ORDER TO CONTINUE OPERATIONS

19. To fund needs critical to the administration of the case and ensure continued operation of the business during the post-petition period, the Debtor has negotiated the terms of this financing facility, as reflected in the Budget. Upon approval by this Court, the DIP Agent will make loans and advances to the estate up to an amount not to exceed $600,000, subject to the terms of the Budget. (The DIP Agent has the right to sell interests in the DIP Facility with respect to funds it has already advanced to the Debtor.) Interest will accrue on all advances at the non-default rate of eight (8%) percent per annum, accruing monthly and payable upon the Maturity Date, or if there is an Event of Default, upon any accelerated payment date of the loan.

20. The Debtor proposes to grant the DIP Liens and the Super-Priority Claims pursuant to section 364(c) of the Bankruptcy Code. Post-petition financing that the Debtor obtains from the DIP Agent and the Lenders will be secured (a) under section 364(c)(2), by all unencumbered property of the Debtor as of the Petition Date and post-petition property of the Debtor, and (b) under section 364(c)(3), by perfected junior liens on all of the Debtor's assets that were subject to valid, properly-perfected liens as of the Petition Date, if any. The DIP Liens and the Superpriority Administrative Claims of the DIP Agent and Lenders granted in connection with the DIP Facility will be subordinate to the Carve-Out described in the Interim Order.

### Grounds for Approval of Interim and Final DIP Borrowing.

21. The Debtor seeks approval of interim and final borrowing pursuant to the terms of the DIP Commitment Letter, as supplemented by the Interim Order. It is submitted that

approval of this borrowing is in the best interest of the estate and its creditors and should be approved.

22. Obtaining credit is governed by section 364 of the Bankruptcy Code, which provides in relevant part:

> (c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
>
> \* \* \* \*
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate is subject to a lien.
>
> (e) The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of the grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

23. It is respectfully submitted that the estate meets the statutory criteria to obtain the relief requested. The Debtor does not have sufficient cash on hand or receivables subject to collection in the next few months to take it through the Chapter 11 process which will allow it to address its financial and operational issues. Because of its precarious financial situation, the Debtor is unable to obtain funding other than post-petition financing in accordance with section 364 of the Bankruptcy Code. With regard to the terms and conditions of the financing facility itself, it is respectfully submitted that the terms and conditions are reasonable in light of the emergent circumstances of this case. The fees and interest rates set forth in the DIP Commitment Letter are more favorable than those generally seen in DIP loan facilities, while the events of default and other conditions are of the type that are customary in Chapter 11 cases.

24. The Debtor has shown ample cause for approval of the proposed borrowing. As evidenced by the Declaration of Jeremy Bernstein, annexed hereto as **Exhibit C**, the financing is vital to the Debtor and the Debtor has determined, after considerable effort to solicit loans from other parties, that the terms offered by the DIP Agent are the best terms available to the Debtor.

25. Finally, the financial accommodations hereunder were negotiated at arms' length and in good faith between the Debtor and MyPlay DIP LLC. The terms and conditions of the financing facility have been the subject of considerable negotiation between the parties and are reasonable under the circumstances, particularly given the Debtor's financial condition. Moreover, the Motion provides appropriate notice to creditors and other parties in interest and an opportunity for such parties to object to the relief requested herein. Accordingly, it is submitted that MyPlay DIP LLC is entitled to the protections set forth in section 364(e) of the Bankruptcy Code.

**The Debtor Requires Interim Financing**

26. Pursuant to Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure, the final hearing on this Motion may be commenced no earlier than fifteen days after service thereof. As previously noted, there is a critical need for financing on an interim basis in order to maintain the Debtor's operations. Consequently, the Debtor seeks interim relief prior to the fifteenth day following the service of this Motion.

27. The Debtor submits that creditors will not be prejudiced by interim relief because such relief is necessary to protect and preserve the assets for the benefit of the estate and its creditors and prevent irreparable harm to the going concern value of the business. The Debtor hereby requests that the Court schedule an interim hearing on this Motion.

## Notice

28.  Notice of this Motion has been given to: (a) counsel to the DIP Agent, (b) any party asserting a lien in the Debtor's assets, (c) the 20 largest unsecured creditors in this case, (d) any party having filed a Notice of Appearance in this case as of the date hereof; and (e) the Office of the United States Trustee.  The Debtor respectfully submits that no further or other notice need be provided under the circumstances of this case.

## No Previous Request

29.  No previous application for the relief sought herein has been made to this or any other court.

**WHEREFORE**, the Debtor respectfully prays for entry of an order (a) scheduling interim and final hearings on this Motion; (b) granting the Debtor authority to borrow in accordance with the DIP Commitment Letter and the Budget, and the proposed Interim Order; and (c) granting the Debtor such other and further relief as is just.

Dated: New York, New York
August 25, 2016

**MYPLAY DIRECT, INC.**
Debtor and Debtor-in-Possession

By: */s/ Jeremy Bernstein*
Jeremy Bernstein,
its Interim Chief Financial Officer

Filed by:

**HALPERIN BATTAGLIA BENZIJA, LLP**

By: */s/ Donna H. Lieberman*
  Alan D. Halperin, Esq.
  Donna H. Lieberman, Esq.
  Julie Dyas Goldberg, Esq.
  40 Wall Street, 37th Floor
  New York, New York 10005
  Phone: (212) 765-9100; Fax: (212) 765-0964
  ahalperin@halperinlaw.net; dlieberman@halperinlaw.net
  jgoldberg@halperinlaw.net

*Proposed Counsel to the Debtor and Debtor-in-Possession*